UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,

19-cr-59 (PKC)

-against-

OPINION
AND ORDER

NIKET JAIN,

Defendant.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

      With a March 30, 2020 scheduled trial, the government advised the Court on February 13, 2020 that it "recently learned that it was in possession of additional materials" that had not been produced to defendant Niket Jain, despite representations that discovery was complete. (Doc. 63). The government estimated the unproduced materials amounted to "approximately 5 terabytes" of data. (Id.)[1] The materials were located on three electronic devices that had been turned over to the government by a key cooperator, Individual-1. The government later revealed that the materials had been in its possession since October 10, 2018. The existence of the materials was known to the original case agent and two members of the prosecution team, one of whom has been on the case continuously since then.

      The Court conducted an evidentiary hearing at which the defendant called as witnesses an Assistant United States Attorney and a Special Agent of the Federal Bureau of Investigation ("FBI"). Other members of the prosecution team provided declarations under penalty of perjury.

---

[1] Arithmetically, 5 terabytes of data is the equivalent of the data stored on 50 devices each with 100 gigabytes of data.

Based upon the entirety of the record, the Court concludes that the failure to timely produce this data was the result of a pattern of inattentiveness, carelessness, failure of recollection, failure of the original case agent to speak up at critical junctures, failure of the original case agent to communicate critical information to his successor, failure of the successor case agent to review the entirety of the case file and failure of a prosecutor to make prudent and timely inquiries of the original and successor case agents. These inexcusable failures bespeak of negligence and not conduct that was intentional or recklessly indifferent to the rights of Jain.

Because of the Covid-19 pandemic, jury trials in the District were suspended and the trial could not have proceeded on March 30. Thus, the non-production did not delay defendant's trial, although the pandemic did.

Jain's trial is now set for jury selection on November 23, 2020 and testimony will begin on November 30. As of the time of trial, counsel for defendant Jain will have had the late produced materials for over nine months, and the Court concludes that any prejudice to the defendant will have fully dissipated.

Indeed, if the non-produced material had been produced in a timely manner when the bulk of discovery was produced in late June 2019, the Court still would have set the original trial date for March 30, 2020, as it did on October 11, 2019. The Court still would not have allowed a new attorney to enter the case for Jain if it would have necessitated moving the March 30 trial date to accommodate his family vacation schedule and the March 30 trial date still would have been delayed by the pandemic.

Defendant's motion to dismiss based upon violations of his rights to due process, counsel of his choice and a speedy trial will be denied. The Court will order certain remedial

action on the part of the Acting United States Attorney and the Special Agent in Charge of the New York Field Office of the FBI.

BACKGROUND

On January 28, 2019, Jain was indicted on one count each of conspiracy to commit securities and wire fraud, securities fraud, wire fraud, and obstruction of justice. (Doc. 1). During the relevant period, Jain is alleged to have been a managing member of an investment company, Aberon Capital Management ("Aberon"), along with a co-conspirator, Individual-1. Jain and Individual-1 are alleged to have provided false representations to two investors, Investor-1 and Investor-2, in the fund controlled by Aberon regarding the fund's performance. (Doc. 1). Jain is also alleged to have obstructed justice by lying to the Securities and Exchange Commission ("SEC") during an inquiry into Aberon. (Doc. 1).

On February 13, 2020, despite previous representations that the production of discovery materials was complete, the government disclosed to the Court that it possessed two computers and a cellular phone belonging to Individual-1, the contents of which had not yet been produced to Jain. (Doc. 63). On February 28, 2020, the contents of these electronic devices were produced to Jain.[2] (Doc. 109-6 ¶ 14). On March 27, 2020, Jain moved to dismiss the indictment, arguing that the government's failure to timely produce the contents of Individual-1's devices was an act of deliberate misconduct that violated his right to counsel of his choice and his right to a speedy trial. (Doc. 73). Jain subsequently argued that the indictment ought to be dismissed for violation of his due process rights. (Doc. 110 at 2).

---

[2] Defendant has been barred from reviewing a subsection of these produced materials because they are asserted to be privileged and subject to a pending clawback motion.

FINDINGS OF FACT

In its inquiry into the government's failure to timely produce the contents of Individual-1's electronic devices and the related statements to the Court regarding the status of discovery productions in the case, the Court has received considerable briefing and held two lengthy conferences with the parties, on April 15, 2020 and May 6, 2020 respectively. The Court has received sworn declarations from the relevant members of the government's prosecution team. (Docs. 109-1 to 109-7). On August 12, 2020, the Court held a hearing on this issue and heard live, in-person testimony from two members of the government's prosecution team, Assistant United States Attorney ("AUSA") Tara La Morte and FBI Special Agent ("SA") Wayne Boddy, who were called as witnesses by defendant. Based on the proceedings in the case and the record on the motion, the Court makes the following findings of fact.[3]

1.      In or around mid-2017, the government began to investigate Jain and Individual-1 for their conduct related to Aberon. (Doc. 109-1 ¶ 1; Doc. 109-2 ¶ 2).

2.      On or about September 12, 2018, Individual-1 was arrested on charges of securities and wire fraud related to Aberon. (Doc. 109-3 ¶ 4).

3.      In addition to the charged crimes, the government was also investigating Individual-1 for possible money laundering offenses involving Aberon. (Boddy Supp. Decl. ¶ 4). SA Boddy did not believe this investigation related to Jain as the Aberon transactions at issue occurred after Jain had left Aberon. (Aug. 12, 2020 Tr. ("Tr.") at 116:12–23 (Doc. 124)).

4.      Following his arrest, Individual-1 participated in proffer sessions with the government's prosecution team, which at that time included AUSA Andrew Adams, AUSA La Morte, and SA Boddy. (Doc. 109-1 ¶ 3).

---

[3] The citation to evidence is for illustrative purposes only and is not intended to imply that it is the only evidence to support a proposition.

5.     During the course of proffer sessions with the government, Individual-1 consented, through his lawyer David Gourevitch, to turn over two computers and a cellular phone (the "Devices"). (Doc. 109-1 ¶ 4). Between October 5 and 9, 2018, all members of the prosecution team were included on (or were forwarded) emails coordinating the retrieval of the Devices by the FBI from Individual-1. (Doc. 109-1 ¶ 4; Doc. 109-2 ¶ 6; Doc. 109-3 ¶¶ 6–7).

6.     On October 10, 2018, SA Boddy retrieved the Devices from Individual-1. SA Boddy turned the Devices over to the FBI's Computer Analysis Response Team, or "CART," for imaging and uploading to an internal FBI review platform called "CAIR." SA Boddy recorded receipt of the Devices and the upload of the contents in an FBI report, which was added to the case file for this investigation.   The case file itself was stored on an internal FBI system called "Sentinel." By October 16, 2018, SA Boddy had returned all of the original Devices to Individual-1. (Doc. 109-2 ¶ 8; Tr. at 18:7–19:16, 115:12–17).

7.     Around this same time, SA Boddy also accessed Individual-1's personal and Aberon Gmail accounts with consent and downloaded their contents to his FBI computer for review. (Doc. 109-2 ¶ 9; Tr. at 89:18–119:4).

8.     Based on information gained from Individual-1 during the proffer sessions, SA Boddy believed that the emails retrieved from the Gmail accounts contained information relevant to the investigation of Jain and, therefore, focused his efforts on reviewing the emails rather than the contents of the Devices.  With the exception of certain text messages, which were related to an investigation of Aberon which he believed to be unrelated to Jain's alleged crimes, SA Boddy did not review the contents of the Devices at this time or at any subsequent point. (Doc. 109-2 ¶¶ 10–11; Boddy Supp. Decl. ¶¶ 1–5, 7; Tr. at 89:3–5, 93:4–17, 107:14–109:3, 117:11–118:7).

9.     On or about December 18, 2018, AUSA Adams was promoted, leaving day-to-day responsibility for the investigation of Jain to AUSA La Morte. (Doc. 109-1 ¶ 6).

10.     On January 28, 2019, Jain was indicted on counts of securities fraud, wire fraud, conspiracy to commit securities and wire fraud, and obstruction of justice. (Doc. 1).

11.     The government began producing materials to Jain in February 2019. (Doc. 109-3 ¶ 10).

12.     To facilitate this production, SA Boddy and AUSA La Morte discussed the materials to be produced. AUSA La Morte requested specific materials from the FBI's case file for production, consisting of two batches of emails collected from Individual-1 and Jain respectively. These materials were then produced and were the only items produced from the FBI's case file at that time. (Doc. 109-2 ¶ 12; Tr. at 94:22–95:12, 98:25–99:22).

13.     AUSA La Morte did not expressly ask SA Boddy to review the entire case file. AUSA La Morte did not have access to the Sentinel system and relied on the FBI case agent to provide materials from the Sentinel system for production in discovery. (Tr. at 22:1–6; Tr. at 118:18–119:10).

14.     SA Boddy did not provide AUSA La Morte with the entire case file because AUSA La Morte did not request it. SA Boddy also did not discuss the Devices with AUSA La Morte because she did not ask about them. (Doc. 109-2 ¶ 12; Tr. at 118:18–119:10). This was a critical communication failure leading to the non-production of the data on the Devices. It reflected a narrow tunnel-vision approach by the Special Agent to his case responsibilities.

15.     At the time of these discussions with SA Boddy, AUSA La Morte did not remember that the government had the contents of the Devices in its possession and did not request

their production for this reason. As such, she did not request them from SA Boddy for production to Jain. (Doc. 109-3 ¶¶ 9, 11, 21).

16.   SA Boddy did not forget about the existence of the Devices and did not realize that AUSA La Morte had forgotten about them. (Tr. at 119:11–120:2).

17.   Allowing for the passage of time which could produce a memory failure, prudence would have suggested that the AUSA ask whether there were materials that she had overlooked or should be considered for possible production. An opened-ended discussion would likely have surfaced the existence of the Devices about which SA Boddy had not forgotten.

18.   At the time of these discussions with AUSA La Morte, SA Boddy believed, based on information gained from Individual-1's proffer sessions, that the Devices contained materials pertaining to the money laundering investigation of Aberon, that he believed was unrelated to Jain. Accordingly, he did not believe that the Devices held exculpatory evidence as to Jain. ((Doc. 109-2 ¶ 10; Boddy Supp. Decl. ¶¶ 1–5; Tr. at 101:16–22, 120:3–9).

19.   SA Boddy did not raise any question or concern that AUSA La Morte only requested the specified emails because the emails from the Gmail accounts, in his view, provided "overwhelming" evidence against Jain, while the Devices contained materials pertinent to a different investigation. (Tr. at 105:3–106:15, 110:4–15).

20.   SA Boddy denied making a conscious decision to not mention or review the Devices in order to avoid producing them to Jain as evidence. (Doc. 109-2 ¶ 13; Tr. at 112:11–113:10, 115:18-21, 120:10–121:1).

21.   On February 14, 2019, AUSA La Morte and SA Boddy appeared before this Court. The Court asked AUSA La Morte to describe in general terms the nature and volume of discovery. AUSA La Morte described the discovery and said she was prepared to produce 90%

of it that day and quantified it as "a little bit over 10,000 pages." She reported that the balance

could be produced "in a fairly short amount of time" but would require a protective order. (Doc.

91 at 3:2–19). Having heard AUSA La Morte's representation in open court, SA Boddy did not

inquire of AUSA La Morte whether she had considered producing the Devices. In a securities

fraud case over a falsely-inflated net asset valuation of an investment fund, it apparently did not

strike the prosecutor worthy of further inquiry that not one single laptop, desktop or cell phone had

been seized or consensually turned over in the investigation by Individual-1 and that the only

electronically-stored data were emails downloaded from Gmail accounts.

22.     In or about April 2019, SA Boddy transferred to another squad within the

FBI and was no longer assigned to the Jain investigation. (Doc. 109-2 ¶ 14).

23.     In or about May 2019, SA Jonathan Polonitza replaced SA Boddy as the

primary case agent assigned to the Jain investigation. (Doc. 109-5 ¶ 2).

24.     During the transition of case agents, SA Boddy did not mention the Devices

and SA Polonitza did not specifically ask about them. SA Boddy did not inform SA Polonitza that

the data from the Devices had been uploaded to the FBI's internal review platform CAIR. Instead,

SA Boddy focused on discussing the review of emails from the Gmail accounts, which was a

higher priority due to their direct relation to the Jain case. (Doc. 109-2 ¶¶ 14–15; Boddy Supp.

Decl. ¶ 6; Tr. 62:14–63:13). SA Boddy departed from the team before SA Polonitza was assigned.

A more fulsome transition discussion would have ensured that SA Polonitza was alerted to the

existence of the Devices and their non-production in the Jain case.

25.     Upon taking over the Jain case, SA Polonitza reviewed the case file, but did

not read every report contained within it. According to SA Boddy, the case file contained an

evidence log that would reveal that the Devices were subject to a CART forensic examination. SA

Polonitza was informed that discovery was complete with the exception of certain of Individual-1's emails that still needed to be produced. SA Polonitza focused on reviewing these emails for production. SA Polonitza did not learn of the Devices until February 2020. (Doc. 109-5 ¶¶ 3–4, 8). A more thorough review of the case file by the new case agent would have revealed the existence of the Devices sooner.

26.     On August 1, 2019, AUSA La Morte, in response to a question from the Court as to whether discovery had been completed, stated the remaining discovery had been sent to Jain at the end of June. (Doc. 19 at 2:13–24).

27.     At the August 1, 2019 conference, Jain, through his retained counsel Vinoo Varghese, requested additional time to review the discovery already produced by the government. (Doc. 19 at 2:25–3:21, 10:6–8). The Court granted Jain's request, setting the next conference for October 11, 2019. (Doc. 19 at 10:20–11:3).

28.     The government then requested to exclude time under the Speedy Trial Act until October 11, 2019 in order to give Jain additional time to review the discovery that had been produced. Jain did not object to this request. The Court granted this request, finding the exclusion justified by the need to give Jain sufficient time to review discovery. (Doc. 19 at 12:13–13:11).

29.     On October 11, 2019, AUSA La Morte, in response to a question from the Court as to whether discovery had been completed, represented that the government was in compliance with its Rule 16 obligations and had only "literally a handful of documents to produce," which would be completed within a week. The Court then set a trial date of March 30, 2020 to which neither side objected. The government moved to exclude time under the Speedy Trial Act until March 30, 2020 in order to permit the government to finish producing "limited additional discovery that will allow the defense to consider its motions" as well as to prepare for

9

trial.  The Court excluded time, without objection from Jain, to permit time to resolve outstanding discovery issues identified at the conference and to prepare for trial.  (Doc. 29 at 5:12–6:15, 8:6–15, 9:6–10:1).

30.     On November 25, 2019, Benjamin R. Allee entered a notice of appearance on behalf of Jain.  (Doc. 33).  At the time he filed the notice of appearance, a cursory review of the docket sheet would have revealed that a trial had been set for March 30, 2020. (Minute entry for October 11, 2019).  Yet the next day, on November 26, 2019, Mr. Allee submitted a letter to the Court, requesting an adjournment of the scheduled March 30, 2020 trial date because it conflicted with his previously scheduled family vacation.  (Doc. 34).  He did not claim ignorance of the trial date when he filed his notice of appearance.  The Court denied this request.  (Doc. 35).

31.     At a December 19, 2019 conference, the Court again declined to adjourn the scheduled March 30, 2020 trial.  The Court advised Mr. Jain that, if Mr. Allee was not available to try the case as scheduled, he should find new counsel.  (Doc. 58 at 4:25–6:24).  Mr. Varghese, Mr. Jain's original counsel, remained counsel to him.

32.     On January 7, 2020, Paul T. Weinstein was substituted for Mr. Allee as counsel for Jain.  (Doc. 53).

33.     On January 23, 2020, Mr. Varghese was permitted to withdraw as attorney for Jain.  (Doc. 57).

34.     On January 28, 2020, AUSA La Morte met with Individual-1.  Individual-1 stated that his cellular phone contained a recording of Jain.  AUSA La Morte did not recall producing such a recording to Jain or that the government possessed Individual-1's phone.  (Doc. 109-3 ¶¶ 14–15).

35.     AUSA La Morte contacted SA Polonitza, asking him to locate these materials if they were in the FBI's possession.  SA Polonitza spoke with SA Boddy who informed him that the data from these Devices were in the FBI's possession and also pointed to the relevant report in the case file.  SA Polonitza then confirmed the government's possession of these materials to AUSA La Morte.  (Doc. 109-3 ¶¶ 15–17; Doc. 109-5 ¶ 8).

36.     AUSA La Morte also reviewed her prior emails from the Jain case, which refreshed her memory as to the retrieval of the Devices.  AUSA La Morte then discussed the Devices with AUSA Adams and AUSA Samuel Raymond, who had recently joined the prosecution team, and decided that the contents of the Devices should be produced to Jain.  (Doc. 109-3 ¶ 16).

37.     On February 11, 2020, the government informed Mr. Jain's counsel of the existence of the Devices.  (Doc. 109-3 ¶ 19).

38.     On February 13, 2020, the government filed a letter on the public docket, informing the Court of the existence of the Devices.  The government advised that the Devices contained approximately 5 terabytes of data, that it was endeavoring to produce this material to Jain quickly, and that it would not oppose any request to adjourn the trial date from Jain in light of this new production of discovery materials.  (Doc. 63).

39.     Following a letter from Mr. Weinstein on behalf of Mr. Jain, the Court scheduled a conference for February 26, 2020.  Based on the arguments raised in Mr. Weinstein's letter, the Court specifically welcomed Jain to invite his prior counsel, Mr. Allee, to attend the conference as well.  (Docs. 66, 67).

40.     During the February 26, 2020 conference, Mr. Jain's counsel requested a briefing schedule for the present motion to dismiss the indictment.  Mr. Weinstein argued that Jain

was denied his choice of counsel because, had the Court known about the large amount of unproduced discoverable materials at the time, the Court would have granted Mr. Allee's request for an adjournment of the trial date and Mr. Allee would not have had to withdraw from the case. (Doc. 93 at 8:6–11:20).

41. The Court stated that it planned to set a trial date and that Mr. Weinstein should "[t]ell me when Mr. All[ee] is available, and I'll accommodate his schedule." Mr. Weinstein requested 90 days to make motions and review materials before trial. In regard to Mr. Allee, Mr. Weinstein argued that, in essence, Jain could no longer afford to rehire Mr. Allee, so was therefore denied his initial choice of retained counsel. The Court noted that Jain could recover any fees paid to Mr. Weinstein except for those incurred in the time since Mr. Weinstein's first appearance and instructed Mr. Weinstein to confer with Jain as to Jain's preference on counsel. In order to deal with the possibility of a conflict of interest on this issue, the Court stated that it would provisionally appoint CJA counsel to advise Mr. Jain. (Doc. 93 at 10:11–20, 11:3–20, 13:9–14:16, 23:19–24:12, 29:12–15).

42. On February 28, 2020, CJA counsel William J. Harrington was provisionally appointed to advise Mr. Jain on the potential conflict of interest raised by Mr. Weinstein. (Doc. 70).

43. On February 28, 2020, the government produced the full contents of the Devices to Jain. (Doc. 109-6 ¶ 14).[4]

44. On March 3, 2020, the Court held a conference with the parties. Mr. Jain conferred with Mr. Harrington, appointed conflicts counsel, as to whether Jain should continue

---

[4] Following this production, an issue arose as to the assertions of privilege over certain documents contained within this production of materials. This privilege issue is the subject of separate motions pending before the Court. (Doc. 75).

with Mr. Weinstein as his counsel, endeavor to rehire Mr. Allee, or apply for representation from the CJA Panel. Following this conferral, Mr. Jain expressed an understanding of the choices available to him and expressed his desire to continue with Mr. Weinstein. (Doc. 96 at 2:13–10:6).

45.    The Court requested the parties' input on setting a new trial date. Mr. Weinstein stated that "it seems like 90 days would be sufficient, if that works for the court and for the government." The Court then rescheduled the trial date for June 1, 2020 and the government moved to exclude time until June 1, 2020 in order to permit the government to respond to Jain's motions and to produce pre-trial discovery materials. The government also argued that time was already automatically excluded by operation of law until the Court ruled on Jain's then pending motions. Mr. Jain did not consent to the exclusion of time. The Court then stated, as a matter of law, Jain's pending motions acted to automatically exclude time. The Court further stated that a continuance until June 1, 2020 outweighed the best interests of the defendant and the public in a speedy trial because it would permit Jain adequate time to review the newly produced discovery from the Devices; on this basis the Court excluded time until June 1, 2020. (Doc. 96 at 10:21–11:11, 13:13–16:1).

46.    On April 15, 2020, the Court conducted a teleconference to inquire into the issues surrounding the production of the Devices. After hearing the parties, the Court required submission of sworn declarations regarding the sequence of events involved in the receipt and production of the Devices from AUSA Adams, AUSA La Morte, AUSA Raymond, SA Boddy, and SA Polonitza. (Doc. 104 at 35:12–17).

47.    On April 20, 2020, Chief Judge Colleen McMahon issued a Standing Order suspending jury trials in this District indefinitely due to the Covid-19 outbreak in New York City. This Order automatically excluded time in all cases under the Speedy Trial Act from April 27,

2020 to June 15, 2020.  20-mc-196 (CM) (S.D.N.Y. Apr. 20, 2020) (Dkt. No. 1).  The Order

documented the reality that jury trials were *de facto* suspended in this District on March 16, 2020,

after the discharge of the jury upon return of a verdict in <u>United States v. Bright</u>, 19-cr-521 (PKC).

Because of the pandemic, no jury was empaneled in this District after March 16, 2020 until the

fall of 2020.

       48.     On April 22, 2020, this Court vacated the scheduled June 1, 2020 trial date.

The Court also excluded time due to the pending motions in this case and, for the avoidance of

doubt, further stated that time was excluded to June 15, 2020 in accordance Chief Judge

McMahon's Order.  (Doc. 108).

       49.     On May 6, 2020, the Court conducted a teleconference with the parties.

During this teleconference, the Court ordered <u>in camera</u> production of certain October 2018 emails

sent by and to members of the prosecution team in this case as well as a review of prior productions

to determine which, if any, versions of a declaration of Semen Kaplan from an SEC investigation

had been provided to Jain.  Further, at Jain's request, the Court set a date for an evidentiary hearing

on the outstanding discovery and privilege issues related to the Devices.  (Doc. 115 at 8:6–14,

25:17–31:7, 39:14–43:23).

       50.     On June 12, 2020, Chief Judge McMahon issued a further Order, continuing

the suspension of jury trials in this District and extending the automatic exclusion of time from

June 15, 2020 to September 8, 2020.  20-mc-196 (CM) (Dkt. No. 2).

       51.     On August 12, 2020, the Court conducted an evidentiary hearing at which

the defense called AUSA La Morte and SA Boddy as witnesses.  (Doc. 124).

52.    AUSA La Morte's testified that the failure to timely produce the Devices resulted from her not recalling their existence between the receipt of the October 9, 2018 email and her discussion with Individual-1 on January 28, 2020.

53.    AUSA La Morte's testimony was truthful and credible.   She did not deliberately fail to disclose and produce the Devices to Mr. Jain in a timely fashion.  The Court does not credit that she intentionally withheld the existence of the Devices; it would be futile to do so because they were known or knowable to two case agents, another AUSA who had left the team, Individual-1, Individual-1's counsel and potentially persons who Individual-1 might cooperate against.

54.    SA Boddy did not deliberately hide or fail to alert AUSA La Morte to the existence of the Devices in order to suppress evidence.  The Court credits SA Boddy's testimony that he associated the Devices with an investigation he believed distinct from the investigation of Mr. Jain.

55.    The Court finds that the government's failure to timely produce the Devices was not deliberate but inadvertent, resulting from inattention, forgetfulness and lack of sufficient communication on the part of AUSA La Morte, SA Boddy, and the other members of the government's prosecution team.

56.    The Court finds that the government brought the non-production of the Devices to light without external prompting.  It would make little sense for the prosecution team to have deliberately kept the Devices from production only for that same team later to make a highly embarrassing disclosure of inattention and incompetence in the production of discovery materials.

57.     The Court finds that Mr. Jain has suffered no prejudice from being represented by Mr. Weinstein. Mr. Allee's request for an adjournment of the March 30, 2020 trial date was denied within 24 hours of his appearance. (Docs. 33, 34). Mr. Allee subsequently withdrew as his family vacation schedule could not accommodate a March 30, 2020 trial date and was replaced by Mr. Weinstein. The portion of Mr. Allee's tenure on the case was brief and uneventful.

58.     Once it was clear that the March 30, 2020 trial date would not go forward, the Court gave Mr. Jain the opportunity to have Mr. Allee rejoin the case. The time elapsed between Mr. Allee's withdrawal and this invitation was minimal and no significant progress had been made in the case during this period. The opportunity to rehire Mr. Allee cures any prejudice that may have been created by Mr. Allee's inability to be present during a March 30, 2020 trial due to his family vacation.

59.     Any argument that Mr. Allee would have not had to withdraw due to the March 30, 2020 trial date's conflict with his family vacation if the Devices had been timely produced is speculative. Had the Devices been produced along with other discovery in or about June 2019 and based on defense counsel's 90 day estimate for the time needed to review the Devices, (Doc. 93 at 23:19–24:12; Doc. 96 at 10:21–11:11), a March 30, 2020 trial date still would have been scheduled in or about October 2019. Mr. Allee would have encountered the same obstacle to moving the March 30 trial date based upon a prescheduled family vacation if he filed a notice of appearance in late November 2019. The March 30 trial date would not have been adjourned but, nevertheless, would have been doomed by the unforeseen consequences of the pandemic.

60.     The Court also finds that Mr. Jain had the benefit of representation of his original counsel in the case, Mr. Varghese, until after Mr. Weinstein's first appearance in the case. Mr. Weinstein and his colleague Mordecai Geisler have been energetic, vigorous, and resourceful in their defense of Mr. Jain during their time on the case.

61.     The Court finds that any prejudice suffered by Mr. Jain from the untimely production of the Devices has dissipated in the months since the production of the Devices.

62.     Upon disclosure of the non-production of the Devices, the Court adjourned the March 30, 2020 trial date.  When requesting counsel's views on a new trial date, defense counsel twice requested a trial date 90 days in the future in order to review the contents of the Devices and make motions.

63.     On September 9, 2020, Chief Judge McMahon declined to continue the suspension of jury trials in this District and did not renew the automatic exclusion of time.  20-mc-196 (CM) (Dkt. No. 4).

64.     The on-going pandemic and the need to take precautionary measures limits the number of jurors who may be summoned to serve and the number of courtrooms that can be outfitted for a safe, socially distanced trial.  As of this date, no criminal trial has been completed in this District since March 16, 2020.  The current trial date of November 23, 2020 was set under Court Protocols for the conduct of a limited number of jury trials under pandemic conditions.  It represents an interval of 238 days from the March 30, 2020 trial date.

CONCLUSIONS OF LAW

Based on the factual findings above, the Court denies Jain's motion to dismiss based on violations of his rights to due process, counsel of his choice and a speedy trial.  The Court also denies Jain's motion in the alternative for the Court to inspect grand jury minutes.

17

I.     <u>Jain's Motion to Dismiss on Due Process Grounds Is Denied</u>.

      65.     "In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct reach[ed] a demonstrable level of outrageousness." <u>United States v. Cuervelo</u>, 949 F.2d 559, 565 (2d Cir. 1991) (alterations in original; internal quotation marks and citations omitted). "[T]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience'. . . ." <u>United States v. Chin</u>, 934 F.2d 393, 398 (2d Cir. 1991) (quoting <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952)). Dismissal is available only in "very limited and extreme circumstances . . . to eliminate prejudice to a defendant in a criminal prosecution, where it was impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct." <u>United States v. Broward</u>, 594 F.2d 345, 351 (2d Cir. 1979) (citing <u>United States v. Fields</u>, 592 F.2d 638, 647–48 (2d Cir. 1978)).

      66.     This case does not fall within the category of cases in which dismissal on such grounds would be appropriate. The Court has found that the government's failure to timely produce the Devices was not deliberate but inadvertent. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). The government did not engage in willful or deliberate conduct in order to gain a strategic advantage and any prejudice suffered by Jain has been eliminated in the months that have passed since the production of the Devices.

      67.     Jain further contends that the government violated his rights to due process by withholding <u>Brady</u> material. Jain asserts that the Devices contain evidence that Aberon was a money laundering operation and specifically points to a declaration of Semen Kaplan from an SEC investigation as exculpatory evidence.

68.     The government has an affirmative duty to disclose favorable evidence known to it, regardless of whether the defendant has requested disclosure. Brady v. Maryland, 373 U.S. 83 (1963). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Material is "suppressed" within the meaning of Brady if it is not "disclosed in time for its effective use at trial." United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (quoting United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001)).

69.     Even assuming that the material identified by Jain constituted Brady material, the government did not "suppress" the Devices and no prejudice arose from its non-disclosure. Upon disclosure of the Devices, the Court adjourned the March 30, 2020 trial date. Jain twice requested a trial date of 90 days in the future in order to review the contents of the Devices and make motions, and the Court rescheduled the trial for June 1, 2020. Ultimately, due to the Covid-19 pandemic, the current trial is set for jury selection on November 23, 2020. Although the data included in the Devices was sizeable, given the length of time Jain had to review the material and the timing of the requests to review the contents, the Court concludes that the Devices have been disclosed in time for their effective use at trial. See United States v. Gil, 297 F.3d 93, 105–07 (2d Cir. 2002) (finding disclosure of exculpatory material on the "eve of trial" constituted a Brady violation).

70.     In the alternative, Jain moves for an order that the Government produce Brady material for evidence that Aberon was used as a money laundering operation. "There is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence

would have produced a different result at trial." Coppa, 267 F.3d at 144. Prejudice is assessed considering the evidence presented at trial. Gil, 297 F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin."). Jain's motion is denied, and any remaining claims of prejudice with respect to Brady material, including materials that the government has asserted to be privileged and are the subject of a pending clawback motion, can be raised by Jain post-trial if necessary.

II.   Jain's Motion to Dismiss on Right to Counsel Grounds Is Denied.

71.   The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This includes the right of a criminal defendant to have the counsel of his or her choice. United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2008).

72.   The Second Circuit has explained that a district court has a "great deal of latitude in scheduling trials and need not grant a continuance so that a defendant may be represented by counsel of his choosing, where such a continuance would cause significant delay." United States v. Griffiths, 750 F.3d 237, 241–42 (2d Cir. 2014) (internal quotation marks and citations omitted). In this case, the Court was well within its latitude to refuse Mr. Allee's request for an adjournment of the March 30, 2020 trial date.

73.   Jain's reliance on United States v. Stein, 541 F.3d 130 (2d Cir. 2008) is misplaced. "[T]he Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." Id. at 156. In Stein, the interference with defendants' relationship with counsel was the consequence of government exerted pressure and influence. There was no such deliberate government interference here. The Court has found that the government's failure to timely

produce the Devices was inadvertent, and not aimed at depriving Jain of his choice to be represented by Mr. Allee.

74.     As described above, any suggestion that Mr. Allee would not have had to withdraw if the Devices had been timely produced is speculative. Had the Devices been timely produced in the period of June through August of 2019, a March 30, 2020 trial date would likely still have been scheduled. Mr. Allee's inability to participate in a March 30, 2020 trial was the product of his own schedule. The Court's decision not to adjourn the trial date for a newly-retained lawyer with a pre-existing scheduling conflict was well within its discretion.

III.     Jain's Motion to Dismiss on Speedy Trial Grounds Is Denied.

75.     Under the Speedy Trial Act, a criminal defendant must be brought to trial within 70 days of the filing of the indictment or the defendant's initial appearance, whichever occurs later. See 18 U.S.C. § 3161(c)(1); United States v. Bert, 814 F.3d 70, 78 (2d Cir. 2016). "If that deadline is not met, the Act provides that the indictment 'shall be dismissed on motion of the defendant.'" Bert, 814 F.3d at 78 (quoting 18 U.S.C. § 3162(a)(2)).

76.     The Act excludes time from the 70-day period for delays resulting from certain enumerated events. See 18 U.S.C. § 3161(h). Relevant to this case, Section 3161(h)(7) permits a "district court to grant a continuance and to exclude the resulting delay if the court, after considering certain factors, makes on-the-record findings that the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial." Zedner v. United States, 547 U.S. 489, 497–98 (2006). Also excluded are periods of delay resulting from a pending pretrial motion, 18 U.S.C. § 3161(h)(1)(D), and the first thirty days that any motion was taken under advisement. 18 U.S.C. § 3161(h)(1)(H).

77.     The court may grant a continuance on the basis that the ends of justice are served by determining that "such action outweigh the best interest of the public and the defendant

in a speedy trial." 18 U.S.C. § 3161(h)(7).  In making this determination, the court considers factors including whether granting a continuance would deny counsel "the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7).  But a court may not grant a continuance under this section due to "lack of diligent preparation . . . on the part of the attorney for the Government." Id.

78.   Jain argues that the continuances the Court granted should be rescinded retroactively because they were based on the government's misrepresentations regarding its discovery obligations.[5]  In response, the government points to United States v. Reichberg, 2018 WL 6599465 (S.D.N.Y. Dec. 14, 2018), in which Judge Woods considered a defendant's motion asserting that the exclusion of time under subsection (h)(7) was improper based on the government's failure to comply with its discovery obligations.  Judge Woods treated the defendant's objection to reconsider retrospectively a prior exclusion of time as a motion for the court to reconsider.  See Reichberg, 2018 WL 6599465, at *8.  In this case, the Court denies Jain's motion on Speedy Trial Act grounds regardless of whether it is construed as a motion to dismiss the indictment or motion to reconsider.

79.   Jain broadly asserts that the exclusions under the Speedy Trial Act during the period in which the government misrepresented the state of discovery should be rescinded, but does not identify any specific exclusion as improper.

80.   The fact that the government's statements regarding its discovery material proved to be inaccurate does not provide a basis for rescinding exclusions under the Speedy Trial Act.  Courts in this district have concluded that excluding time under the Speedy Trial Act requires "bad faith" conduct or an "unjustifiable" lack of diligent preparation.  See United States v.

---

[5] Jain argues for dismissal on Speedy Trial Act grounds, and his motion does not assert a violation of his right to a speedy trial under the Sixth Amendment.

Esquilin, 205 F.3d 1325, 2000 WL 232162, at *2 (2d Cir. Feb. 18, 2000) (unpublished decision) (considering an exclusion due to the filing of a pretrial motion and finding that "[g]overnment failure to comply with discovery rules can prevent exclusion of time from speedy trial calculations if that failure is chronic or in bad faith"); Reichberg, 2018 WL 6599465, at *7 ("Conduct on the part of the 'attorney for the Government' demonstrates a lack of diligent preparation within the meaning of Subsection (h)(7)(C) if that conduct is 'unjustifiable.'"); United States v. Vasquez, 1989 WL 82422, at *5 (S.D.N.Y. July 17, 1989) (same).

81.     The government's inaccurate representations also do not provide a basis for reversing the continuances after the untimely production of the Devices. On March 3, 2020, Jain did not consent to the government's request to exclude time. The Court found that granting a continuance would outweigh the best interest of the public and the defendant in a speedy trial in order to permit Jain adequate time to review the newly produced discovery from the Devices. When ruling on the request, the Court was aware of the government's discovery failures. See United States v. Tunnessen, 763 F.2d 74, 78 (2d Cir. 1985) ("[T]he precise reasons for the decision need not be entered on the record at the time the continuance is granted."). As the Court stated at the hearing, Jain's pending motion also automatically excluded time as a matter of law, and in any case, due to the Covid-19 outbreak the District's standing orders automatically excluded time in all cases under the Speedy Trial Act.

82.     As noted, the pandemic *de facto* suspended trials in this District as of March 16, 2020. An intervening and superseding cause unrelated to the government's late production would have thwarted a March 30 trial. Jain has not demonstrated a violation of the Speedy Trial Act.

IV.     Jain's Motion for the Court to Inspect Grand Jury Minutes Is Denied.

83.     In the alternative, Jain requests the Court perform an *in camera* inspection of the grand jury minutes. "It is well-settled that a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." United States v. Forde, 740 F. Supp. 2d. 406, 413 (S.D.N.Y. 2010) (quoting United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978)).  Jain asserts that a "particularized need" exists due to the government providing inconsistent descriptions at the August 12, 2020 evidentiary hearing regarding the identity of the beneficial owner of Investor-1, as named in the Indictment.

84.     Jain does not assert that the government engaged in misconduct instructing the grand jury, see, e.g., United States v. Torres, 901 F.2d 205, 232 (2d Cir. 1990) (abrogated on other grounds by United States v. Marcus, 628 F.3d 36 (2d Cir. 2010)), or provided incomplete or erroneous legal instructions, see, e.g., United States v. Brito, 907 F.2d 392, 394 (2d Cir. 1990). Instead, Jain argues that the grand jury minutes should be inspected to guard against the government modifying the identity of Investor-1 presented to the grand jury as compared to the anticipated evidence at trial.  These allegations fall short of the particularized need required to inspect grand jury minutes.  Even if the evidence introduced at a potential trial regarding the identity of Investor-1 was not the same as the evidence presented to the grand jury, this would not amount to a constructive amendment of the indictment.  "[W]e have consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." United States v. Berger, 224 F.3d 107, 117 (2d Cir. 2000) (internal quotation marks and citation omitted) (finding no constructive amendment of a wire fraud charge that included all of the essential elements of the claim and where the defendant was fully informed of the nature of the charge).

CONCLUSION

        Jain's motion to dismiss the indictment and for other relief is DENIED.  The Clerk is directed to terminate this motion.  (Doc. 73).

        The Court notes that the present Acting United States Attorney for this District did not assume her position until June 20, 2020.  Likewise, the Special Agent in Charge of the New York Field Office of the FBI (the "SAC") did not assume her position until December 12, 2019. Nevertheless, the Court directs the Acting United States Attorney and the SAC and members of their senior staff to meet and confer on the corrective actions they will undertake to ensure that this sorry chapter cannot be repeated.[6]  A report of their corrective actions shall be publicly filed on the docket by December 18, 2020.

        This must not happen again.

        SO ORDERED.

                                    P. Kevin Castel
                            United States District Judge

Dated:  New York, New York
        October 13, 2020

---

[6] The undersigned is well aware of Judge Nathan's recent opinion in United States v. Nejad, 18-cr-224 (AJN), 2020 WL 5549931 (S.D.N.Y. Sept. 16, 2020).  Several of the "Issues [That] Call for Systemic Solutions" identified by Judge Nathan are implicated in this case, e.g., Items, 6, 9, and 10.  Id. at *6.